Charles Van Brocklin and Elsie Van Brocklin, Plaintiffs-Appellees, v. Herman Gudema, Defendant-Appellant.

Gen. No. 11,872.

Second District.

June 15, 1964.

Eaton & Leemon, of Mt. Carroll (John A. Leemon, of counsel), for appellant.

Melvin Finer, of Mt. Carroll, and L. Willard Nelson, of Morrison, for appellees.

MORAN, J.

This is a negligence action to recover damages for the pollution of plaintiffs' well. The case was tried by a jury, which returned a verdict in favor of plaintiffs in the amount of $1,500, and the defendant appeals.

The plaintiffs and the defendant own adjoining farm property near Shannon, Illinois. The defendant also owns a stockyards in the Village of Shannon, and it is there, in a sense, that the trouble began. Not surprisingly, one of the by-products of a stockyards is manure. Every Spring, the defendant had the problem of disposing of the large quantity of manure which would accumulate in the yards over the winter months. His usual procedure was to spread it on his fields as fertilizer, and this worked well for a number of years. The Spring of 1961, however, was an exceptionally wet one. The fields were muddy, and the defendant was unable to negotiate them with his trucks to deposit the manure. He decided upon an alternate plan. At

his farm he had a barnyard with a concrete floor. He had his employees haul a number of truckloads of material from the stockyards to this barnyard and dump it there to await the time when the weather would permit its removal to the fields. The evidence is in dramatic conflict as to what was hauled and how much there was. The plaintiffs and their witnesses say there were about 400 truckloads, and that it was all manure, with maybe a little straw mixed in. The defendant and his witnesses say there were 15 to 20 loads, and that it was mostly straw, with a little manure mixed in. The plaintiffs offered photographs of the pile, and we have them before us. From these photographs we can certainly tell that the pile was a large one, but can make no conclusive determination as to its composition.

The defendant's barnyard was situated immediately adjacent to the plaintiffs' property. The plaintiffs' well was located just inside their property line, and about 15 or 20 feet from the point where the material from defendant's stockyards was piled. This well was the only source of water for the plaintiffs and their family. Their testimony was that the well had given them good service from the time they bought the property in 1958 up until the introduction of defendant's manure pile in March of 1961. There was no evidence to the contrary. The plaintiffs had an outdoor toilet that was located about 10 or 15 feet from the well, but they have inside plumbing and they testified that the outhouse had not been used since they purchased the property. One of defendant's employees testified that he had used it a couple of times.

Both sides agree that there were some heavy rains shortly after the substance in question was piled in the defendant's barnyard. The plaintiffs testified that when the manure pile had been on defendant's prop-

erty a few days, their water turned the color of manure, began to smell like manure, and developed a foul taste. Other witnesses corroborated these impressions. The plaintiff Charles Van Brocklin testified that he became sick to his stomach and developed diarrhea from drinking water. Samples of the water, taken from plaintiffs' kitchen and bathroom taps and from the well itself, were tested by a bacteriologist, who testified on behalf of plaintiffs that the water was contaminated with coliform bacteria. Positive findings were made as late as December, 1961.

It is not clear from the record just how long the pile remained in the barnyard. Plaintiffs testified that the color and smell of the water began to improve when the pile was removed. However, it was not until December of 1961, eight months after the contamination first appeared, that they were able to resume use of the water for drinking, cooking and bathing. During this eight-month period, the plaintiff Charles Van Brocklin brought a fifteen-gallon container of water home each day in his automobile from the filling station where he was employed. This is what the family used for drinking and cooking, and their bathing was confined to "sponge baths."

The defendant testified that his barnyard sloped away from the plaintiffs' property. An engineer who specializes in the construction of septic systems examined the scene and testified on behalf of defendant that the topography was such that in his opinion water from the defendant's property would not run onto plaintiffs' property. He ventured the further opinion that the contamination of plaintiffs' well could have been caused by the proximity of plaintiffs' own outdoor toilet. The witness stated on cross-examination that, assuming the outdoor toilet had not been used, he would have no opinion as to the cause of the pollution of the well.

24

As against this testimony of the defendant and his engineer, the plaintiff Charles Van Brocklin testified that water did run off the manure pile onto his property in the direction of the well. He did not specifically state that he saw this happen, but he did state it unequivocally as a fact, on both direct and cross-examination, and no objection was made to his testimony.

■ Defendant contends that the evidence is insufficient to show that he was guilty of negligence. We disagree. The evidence is clear that defendant knew the location of plaintiffs' well. Indeed, in happier days he purchased water from it for his livestock. The evidence further shows that he piled a large quantity of manure (any doubt as to the nature or quantity of the material is at this point resolved against the defendant) in close proximity to plaintiffs' well. He knew it was a rainy season, and (resolving against the defendant any question as to which way the water would run) the jury could reasonably have found that he should have foreseen that contaminated water would run off the pile onto plaintiffs' land and affect the well. The jury was given the proper definition of negligence (IPI 10.01), and we do not believe it was against the manifest weight of the evidence for them to find that the defendant's conduct came within that definition.

■ The defendant also argues that the evidence failed to show any conduct of his was the proximate cause of the damage to the well. He relies upon his testimony and that of his engineer concerning the slope of the land, and the testimony tending to suggest that the plaintiffs' outdoor toilet may have been the source of the pollution. There was, however, both direct and circumstantial evidence tending to incriminate the manure pile. Charles Van Brocklin testified that

the water did run from the manure pile to his well. The evidence is uncontradicted that there was no problem before the pile was there, and that the pollution diminished and eventually disappeared after the pile was removed. The pollution was of a type that could be caused by manure. The color and smell of the water suggested manure. The evidence of the plaintiffs is that their outdoor toilet was not used. Considering all these circumstances, the evidence of proximate cause was sufficient for the jury.

Defendant's next contention is that there was no evidence of pecuniary damage to the plaintiffs. It is true that no evidence was offered to show the dollar amount of any damages sustained. Defendant suggests that plaintiffs could have offered evidence of the depreciation in the rental value of their property during the time the well was polluted. He also argues that evidence would have been admissible to show the value of Charles Van Brocklin's time in transporting the water from the filling station. Defendant earnestly contends that, in the absence of this kind of testimony showing measurable pecuniary loss, the jury had no factual basis for an award of damages and was forced to speculate. To support his argument, defendant points to the amount of the verdict, which he says is far in excess of what would be reasonable compensatory damages.

■ Where the dollar amount of damages sustained is capable of precise proof, then evidence of the exact amount should be offered. However, this does not mean that damages incapable of exact measurement cannot be recovered. In personal injury cases, for instance, it frequently happens that the major portion of an award will consist of compensation for pain and suffering, disability and disfigurement, although, ob-

26

viously, there will have been no testimony establishing the monetary value of those elements. In the instant case, we believe the actual elements of damages sustained by the plaintiffs are incapable of exact pecuniary measurement. These are the elements of inconvenience and discomfort involved in having no water supply for eight months. Prior to the contamination of their well, the plaintiffs had a plentiful supply of water for drinking, cooking and bathing. For eight months, they were deprived of this valuable asset, being forced to drink water from a filling station and take "sponge baths." We do not overlook the fact that the eight-month period of contamination included all of the hot summer months. To relegate the plaintiffs to a recovery of lost rental value or the value of the time spent in transporting the water would be to indulge in fiction. There was no question of lost rents. The plaintiffs did not lease the property to others, and had no intention of doing so; they lived on it. Charles Van Brocklin spent very little time which could be attributed to transportation of the water from the filling station to his home; he had to make the trip anyway. Neither would the nominal value of the water obtained from the filling station be an adequate measure of the damages actually sustained.

The question presented, then, is whether the law permits recovery for the elements of inconvenience and discomfort entailed in the temporary loss of a water supply caused by the negligence of another. We find no Illinois negligence cases exactly in point, but several cases have discussed this precise question of damages in connection with the law of nuisance. We find these cases entirely apposite, although they have not been cited by either side. In the early case of Gempp v. Bassham, 60 Ill App 84 (3rd Dist 1894), plaintiff

27

brought suit for the nuisance created by the defendant's livery stable on the adjoining premises. It was shown that the unwholesome smells and loud noises from the stable interfered with plaintiff's enjoyment of his home, and "that the water in Appellant's well was polluted and rendered unfit for use by the drainage from large quantities of manure, straw, etc., thrown out of the stable by appellee and left in heaps near the well." The trial court instructed the jury to the effect that plaintiff could not recover unless the actual amount of his damages had been shown, and that " 'in no event, under the pleading and proof, if you find for the plaintiff, can he recover greater damages for the injury to the use, occupation and enjoyment of his premises than the depreciation of the rental value of such premises.' " (60 Ill App at 86, 87). The Appellate Court held that these instructions were erroneous, and reversed the judgment for defendant:

> "Where the injury is to physical comfort and results in deprivation of the comfortable enjoyments of a home, the measure of damages is not the depreciation in the rental value of the premises occupied by the plaintiff, but compensation for such physical discomfort, and deprivation of the use and comforts of the home.
>
> "The amount in dollars necessary to compensate the plaintiff in such cases is not to be estimated by witness(es) or the 'actual amount' thereof established by testimony or calculated by any arithmetical rule.
>
> "It must be left to the sound judgment, experience and discretion of the jury to fix the amount in view of the facts of each particular case. (Citations omitted.)" (60 Ill App at 87.)

o o o o o o o

". . . (T)he depreciation in rental value is not the measure of his damages, nor was it incumbent upon him to establish by the evidence the 'actual amount' of his damages." (60 Ill App at 88.)

█ The rule of damages announced in the Gempp case was approved by this court in Fox v. City of Joliet, 150 Ill App 491, 495, 496 (2d Dist 1909), a case involving pollution of a stream. See also Illinois Central R. Co. v. Grabill, 50 Ill 241, 246 (1869); N. K. Fairbank Co. v. Nicolai, 167 Ill 242, 247, 47 NE 360 (1897); Racine v. Catholic Bishop of Chicago, 290 Ill App 284, 287, 8 NE2d 210 (2d Dist 1937); Cook v. City of DuQuoin, 256 Ill App 452, 457, 458 (4th Dist 1930); Berger v. Minneapolis Gaslight Co., 60 Minn 296, 62 NW 336, 338 (1895); Riblet v. Spokane-Portland Cement Co., 45 Wash2d 346, 274 P2d 574, 579 (1954); Oklahoma City v. Eylar, 177 Okla 616, 61 P2d 649 (1936); Green v. General Petroleum Corp., 205 Cal 328, 270 Pac 952, 956 (1928). On the basis of these authorities, we conclude that plaintiffs were not limited to a recovery of damages for depreciation in the rental value of their premises, or the value of Charles Van Brocklin's time. They were entitled to recover for their inconvenience and discomfort during the period their well was contaminated. Testimony as to the dollar amount of such damages was not possible, nor was it necessary.

█ The award of the jury was liberal, but not so high as to indicate that it was based upon passion and prejudice. Accordingly, the amount of the verdict provides no ground for reversal.

█ The defendant argues that the plaintiffs could not properly have recovered for inconvenience and discomfort, since these elements were not pleaded in the complaint, and, being special damages, they had to be pleaded in order to furnish a basis for recovery.

We need not pass on this point because it was not seasonably raised at the trial. It is true that the complaint does not mention these elements. In fact, the complaint is entirely silent as to the specific nature of the damages sustained, alleging merely that ". . . because of the foregoing negligence of the Defendant the well of the Plaintiffs became polluted and contaminated and destroyed," and ". . . the plaintiffs have been damaged in the sum of $2,500." No objection was made to the generality of these allegations, however, and the defendant simply filed an answer denying them. At the trial, no objection was made to the evidence concerning the plaintiffs' tribulations resulting from the pollution. The defendant offered no instruction which defined or delimited the elements of damages which the jury could properly consider under the pleadings. He did offer an instruction to the effect that, if the jury found the defendant negligent, but further found that plaintiffs had sustained no damage, they should return a verdict "for the Plaintiffs with no damages." The trial court properly refused this instruction, which was offered by defendant on his mistaken theory that there had to be testimony establishing damages in a dollar amount. The defendant did not even raise in his post-trial motion the point he now urges about the plaintiffs' failure to plead special damages. Therefore, no ruling of the trial court on this question is before us for review, and we have nothing to decide.

■ Defendant's final point is that there is a fatal variance between the pleading and the proof, since the complaint alleged that the well was "polluted and contaminated and destroyed," and the evidence showed merely that the well was polluted and contaminated. Defendant was not prejudiced by the failure to prove permanent destruction, and in no event could this be considered a fatal variance. His point

30

is undue technical; moreover, it is an afterthought. It was one of defendant's own instructions which informed the jury that it was the plaintiffs' burden to show that their well was "damaged," and that if they did prove this, among other things, then they were entitled to recover.

We find no error in this record and the judgment of the trial court is affirmed.

Affirmed.

ABRAHAMSON, P. J. and CARROLL, J., concur.